IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Glenn Varner, | ) | C/A No.: 1:20-cv-1288-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | ORDER |
| Andrew M. Saul, | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a final order pursuant to 28 U.S.C. § 636(c), Local Civ. Rule 73.01(B) (D.S.C.), and the order of the Honorable Donald C. Coggins, Jr., United States District Judge, dated July 15, 2020, referring this matter for disposition. [ECF No. 8]. The parties consented to the undersigned United States Magistrate Judge's disposition of this case, with any appeal directly to the Fourth Circuit Court of Appeals. [ECF No. 7].

Plaintiff files this appeal pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act") to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying the claim for disability insurance benefits ("DIB").[1] The two issues before the court are

---

[1] It appears Plaintiff also applied for Supplemental Security Income ("SSI"), as he received a Notice of Disapproved Claim as to "Retirement, Survivors, and Disability Insurance" and "Supplemental Security Income." Tr. at 106–

whether the Commissioner's findings of fact are supported by substantial evidence and whether he applied the proper legal standards. For the reasons that follow, the court reverses and remands the Commissioner's decision for further proceedings as set forth herein.

I.    Relevant Background

A.    Procedural History

On September 15, 2015, Plaintiff protectively filed an application for DIB in which he alleged his disability began on January 1, 2007. Tr. at 57, 181–87. His application was denied initially and upon reconsideration. Tr. at 106–10, 114–17. On August 28, 2018, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Linda Diane Taylor. Tr. at 29–56 (Hr'g Tr.). The ALJ issued an unfavorable decision on January 28, 2019, finding Plaintiff was not disabled within the meaning of the Act. Tr. at 7–23. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–6. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on April 3, 2020. [ECF No. 1].

---

10. However, the record does not contain an application for SSI, and the ALJ mentions only an application for DIB in his decision. *See* Tr. at 10. As Plaintiff has raised no issue as to consideration of an application for SSI, the undersigned has considered only his claim for DIB.

B.    Plaintiff's Background and Medical History

1.    Background

Plaintiff was 54 years old at the time of the hearing. Tr. at 34. He completed the eleventh grade. Tr. at 36. His past relevant work ("PRW") was as a construction worker. Tr. at 37. He alleges he has been unable to work since January 1, 2007. Tr. at 181.

2.    Medical History[2]

On March 28, 2012, Plaintiff presented to Edward Jones, M.D. ("Dr. Jones"), for monitoring as to gastroesophageal reflux disease ("GERD"), hypercholesterolemia, hyperlipidemia, hypertension, back pain, and an ingrown toenail on his left foot. Tr. at 296. He denied taking medication for hypercholesterolemia and indicated he was out of medication for hypertension. *Id.* He described throbbing lower right-sided back pain that radiated to his right buttocks and interrupted his sleep. *Id.* He indicated his pain was relieved by nonsteroidal anti-inflammatory drugs ("NSAIDs") and requested that Flexeril be refilled. *Id.* His blood pressure was elevated at 166/90 mmHg. *Id.* He weighed 288 pounds and was 71 inches tall. Tr. at 297. Dr. Jones noted tenderness to palpation of Plaintiff's lumbar spine, normal gait, intact cranial nerves, and an ingrown toenail on the left great toe. *Id.* He prescribed Nexium 40 mg for GERD, Amlodipine 10 mg and Benazepril 40

---

[2] The record contains no treatment notes prior to March 28, 2012.

3

mg for hypertension, Keflex 500 mg for the ingrown toenail, and Flexeril 10 mg for muscle spasms. *Id.* He advised Plaintiff to soak his foot and indicated he would refer him to a podiatrist if the toe did not improve with antibiotics. *Id.*

Plaintiff presented to Amanda Sanchez, FNP ("NP Sanchez"), for follow up as to degenerative disc disease ("DDD"), GERD, hypercholesterolemia, and hypertension on September 7, 2012. Tr. at 293. He indicated his GERD was controlled, but he could not afford Nexium and needed less expensive medication. *Id.* He denied taking Crestor and indicated he was out of medication for hypertension. *Id.* He described severe, throbbing back pain that interrupted his sleep. *Id.* He noted Flexeril was no longer effective and requested stronger medication for his back pain. *Id.* His blood pressure was elevated at 170/120 mmHg. Tr. at 294. He weighed 286 pounds. *Id.* NP Sanchez noted normal findings on physical exam. *Id.* She prescribed Tramadol 50 mg for back pain, Omeprazole 40 mg for GERD, and Amlodipine 10 mg for hypertension. Tr. at 295. She stopped Crestor, Nexium, and Benazepril. *Id.* She encouraged diet and exercise and instructed Plaintiff to return the following week for a blood pressure recheck. *Id.*

Plaintiff presented to NP Sanchez for a blood pressure check on September 10, 2012. Tr. at 291. His blood pressure was 200/105 mmHg. Tr. at

292. NP Sanchez assessed uncontrolled hypertension, administered Clonidine 0.1 mg in office, and prescribed Benazepril 40 mg and Norvasc 10 mg. *Id.*

Plaintiff complained of a sore throat, fever, and neck pain on October 4, 2012. Tr. at 289. Dr. Jones noted congested nose and enlarged tonsils, white plaques, and exudates in the throat. Tr. at 290. A strep screen was positive. *Id.* Dr. Jones diagnosed acute tonsilitis and fever and prescribed Cefdinir 300 mg. *Id.*

Plaintiff presented to Patrick Reppert, M.D. ("Dr. Reppert"), to establish treatment on October 20, 2014. Tr. at 312. He complained of a sore back and an ingrown toenail. *Id.* He reported limited activity due to pain and radiation to the right lateral thigh, but denied bowel and bladder incontinence, saddle anesthesia, and loss of strength in his extremities. *Id.* His blood pressure was elevated at 153/84 mmHg. *Id.* He weighed 302 pounds. *Id.* Dr. Reppert noted a large erythematous area on the medial aspect of Plaintiff's right toenail with foul-smelling purulent discharge. *Id.* He also observed diffuse tenderness over Plaintiff's back and positive straight-leg raising ("SLR") test on the right with normal gait, balance, motor strength, sensation, and deep tendon reflexes ("DTRs"). Tr. at 313. He instructed Plaintiff to follow up in the clinic for removal of his ingrown toenail within a couple of days and to go to the emergency room if he developed severe pain or a fever. *Id.* He stated Plaintiff needed to lose weight

to address his lumbago and recommended he lose 25 pounds over the next six months. *Id.* Plaintiff followed up on October 22, 2014, for partial nail avulsion. Tr. at 314.

Plaintiff complained of back pain and hypertension and requested a referral for an MRI on March 20, 2015. Tr. at 315. He described shooting pain down both legs and indicated he felt as if his back pain were worsening. *Id.* He endorsed weakness and denied incontinence. *Id.* His blood pressure was elevated at 177/81 mmHg and he reported having run out of Benazepril several days prior. *Id.* He weighed 310 pounds. *Id.* Maribeth Porter, M.D. ("Dr. Porter"), noted limited lumbar range of motion ("ROM"), intact strength and sensation, normal gait, normal balance, normal motor function, equal and symmetric DTRs, and intact sensation. Tr. at 316. She refilled Benazepril, prescribed ibuprofen and Flexeril for back pain, and indicated she would refer Plaintiff to a neurosurgeon given the length of time he had experienced symptoms. *Id.*

On July 22, 2015, Plaintiff complained of back pain, but indicated he had been unable to follow up with a neurosurgeon because his wife lost her job and their health insurance. Tr. at 317. He indicated he would like to follow up with a neurosurgeon for reassessment, as he had previously seen a neurosurgeon who recommended surgery. *Id.* Saint Julian Springs, M.D. ("Dr. Springs"), observed decreased ROM at the waist, pain with flexion and

extension, difficulty lying flat on the exam table, normal gait, normal balance, normal motor function, equal and symmetrical DTRs, and intact sensation. Tr. at 318. He assessed unstable lumbago and controlled benign hypertension. *Id.* He counseled Plaintiff on weight loss, encouraged use of home physical therapy exercises, again referred him to a neurosurgeon, and refilled his medications. *Id.*

On November 30, 2015, Plaintiff reported high blood pressure and indicated he ran out of Coreg three days prior. Tr. at 310. He endorsed low back pain with minimal relief from physical therapy. *Id.* He indicated his back pain was keeping him up at night. *Id.* He said he had previously worked 12-hour days, but could only work three because of his pain. *Id.* He described weakness and radicular pain to his right leg. *Id.* He weighed 310 pounds and his blood pressure was 146/78 mmHg. *Id.* William D. Strickland, M.D. ("Dr. Strickland"), noted mild spinous tenderness at L3–4, no edema, 4/5 right hip flexion, and 5/5 strength throughout the rest of Plaintiff's lower extremities. *Id.* He assessed benign essential hypertension and lumbago. Tr. at 311. He prescribed Neurontin 600 mg for lumbago. *Id.* He advised Plaintiff to consider magnetic resonance imaging ("MRI"), but Plaintiff noted he would not pursue further imaging at the time. *Id.* He stated Plaintiff appeared to have a depressed mood given his inability to work. *Id.* He refilled Benazepril HCl 40 mg, Carvedilol 12.5 mg, and Flexeril HCl 5 mg. *Id.*

On February 16, 2016, x-rays of Plaintiff's lumbar spine showed: (1) mild-to-moderate DDD and moderate arthropathy of the lumbar spine; (2) grade I degenerative retrolisthesis of L2 on L3; and (3) remote-appearing anterior height loss of T11, T12, and L1. Tr. at 320.

On February 17, 2016, state agency medical consultant Cleve Hutson, M.D. ("Dr. Hutson"), reviewed the record and assessed Plaintiff's physical residual functional capacity ("RFC") as follows: occasionally lift and/or carry 20 pounds; frequent lift and/or carry 10 pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; occasionally stoop, kneel, crouch, and crawl; frequently climb ramps and stairs; never climb ladders, ropes, or scaffolds; and avoid concentrated exposure to hazards. Tr. at 63–65, 72–74. A second state agency medical consultant, Isabella McCall, M.D. ("Dr. McCall"), affirmed Dr. Hutson's RFC assessment on December 8, 2016. *Compare* 63–65 *and* 72–74, *with* Tr. at 86–88 *and* 99–102.

Plaintiff followed up for back pain and medication refills on April 6, 2016. Tr. at 324. He weighed 311 pounds and his blood pressure was elevated at 168/92 mmHg. *Id.* Scott S. Lloyd, M.D. ("Dr. Lloyd"), assessed lumbar foraminal stenosis and essential hypertension and referred Plaintiff to an orthopedic surgeon. *Id.* He refilled Percocet 5-325 mg, started Amlodipine

Besylate 5 mg, and changed Neurontin 300 mg from two capsules three times a day to one-to-two capsules three times a day. *Id.*

Plaintiff presented to Medical University of South Carolina ("MUSC") Health Neurosurgery Spine to establish care for lumbago on June 2, 2016. Tr. at 329. He complained of weakness in his legs and reduced ability to hold his urine since receiving injections. *Id.* He stated his lower back pain had started radiating into his bilateral hips and legs over the prior months and was worse on the right than the left. *Id.* He described aching and weakness in his legs with numbness on the outside of his thighs that stopped at his knees. *Id.* He indicated his pain worsened with walking and bending. *Id.* Margaret K. Brothers, FNP ("NP Brothers"), emphasized a need for weight loss. *Id.* She noted Plaintiff's blood pressure was elevated at 149/81 mmHg and he weighed 317 pounds, but cited no significant findings on physical exam. Tr. at 330.

Plaintiff followed up with Abhay K. Varma, M.D. ("Dr. Varma"), at MUSC Neurosurgery Clinic on June 21, 2016. Tr. at 333. He reported having presented to a neurosurgeon who offered surgery in 2006. *Id.* He indicated he instead opted for conservative treatment that had included unsuccessful physical therapy and 10 to 15 steroid injections that alleviated his pain for only a week or two at a time. *Id.* He described pain that had worsened over the prior two years, radiating down the lateral aspect of both thighs to the

knees and being worse on the right. *Id.* He endorsed numbness, right leg weakness, and aggravation upon walking, bending, and sitting for long periods. *Id.* Dr. Varma noted Plaintiff's blood pressure was elevated at 157/88 mmHg. Tr. at 334. He observed 5/5 motor strength in the upper and lower extremities, right-sided low back pain on SLR test, 2+ and symmetric reflexes, and impaired sensation at the right leg below the knee at the site of a skin graft. Tr. at 334–35. He noted an MRI of the lumbar spine showed mild disc height loss at L3–4 and L4–5 with epidural lipomatosis throughout the lumbar spine that was worse at L4–5 and L5–S1, causing stenosis. Tr. at 335. He concluded Plaintiff's best treatment option was weight loss, as opposed to surgical decompression. *Id.* He noted that Plaintiff might consider a referral for bariatric surgery if he were unable to lose weight independently. *Id.*

On December 15, 2016, state agency psychological consultant Lisa Clausen, Ph.D., reviewed the record as to Plaintiff's mental impairment, considered Listing 12.04 for affective disorders, and concluded he had no severe impairment. Tr. at 98.

On May 8, 2017, a computed tomography ("CT") scan of Plaintiff's thorax showed degenerative changes of the spine, costal chondral calcifications, coronary artery calcifications, and a one-centimeter diameter

low-density mass in the lateral inferior left breast. Tr. at 392–95. A mammogram was negative. Tr. at 389–91.

On August 28, 2017, Plaintiff complained of back pain and his weight had increased, despite his assertion that he followed a healthy diet. Tr. at 381. He indicated he was tolerating Metformin well and had not yet started Victoza. *Id.* John W. Burk, M.D. ("Dr. Burk"), noted Plaintiff was slow to rise from a chair and had decreased ROM of the back in all directions, pain with flexion and extension, and tenderness to palpation of the bilateral sacroiliac ("SI") joints. Tr. at 382. He instructed Plaintiff to continue Oxycodone, Metformin HCl, and Victoza. Tr. at 383.

On October 5, 2017, Plaintiff reported stable back pain and indicated he was tolerating Metformin and Victoza for diabetes without complication. Tr. at 377. His blood pressure was slightly elevated at 143/84 mmHg, and he weighed 314 pounds. Tr. at 378. Dr. Burk stated Plaintiff was slow to rise from a chair and had limited ROM of his back in all directions, pain with flexion and extension, and tenderness to palpation of the bilateral SI joints. *Id.* He refilled Omeprazole, Lisinopril, Amlodipine Besylate, Naproxen, Novofine, Victoza, and Oxycodone HCl. Tr. at 379.

Plaintiff reported stable back pain and indicated he was exercising and reducing his portion sizes on November 6, 2017. Tr. at 374. Dr. Burk noted Plaintiff's weight had increased by 10 pounds to 324.2 pounds, after he had

lost nine pounds at his last appointment. Tr. at 374, 375. Plaintiff's blood pressure was elevated at 141/77 mmHg and he indicated his Lisinopril refill did not go through to his pharmacy. *Id.* Dr. Burk noted Plaintiff was slow to rise from a chair and had limited ROM in all directions, pain with flexion and extension, and tenderness to palpation of the bilateral SI joints. Tr. at 375. He noted Plaintiff's hemoglobin A1c was 6.8%, consistent with well-controlled glucose on his current therapy. *Id.* He refilled Lisinopril and Oxycodone. *Id.*

Plaintiff followed up for weight loss, diabetes, and hypertension on December 6, 2017. Tr. at 371. He indicated his back pain was worse than usual and was affecting his sleep. *Id.* He said he was performing "tile work" with his son that might be exacerbating his pain. *Id.* He noted he had reduced his sugar and soda consumption and was occasionally walking on a treadmill, although his back pain prevented him from doing more. *Id.* He weighed 327.8 pounds and his blood pressure was elevated at 156/82 mmHg. Tr. at 372. Dr. Burk noted limited ROM, paralumbar and bilateral SI joint tenderness, and pain with flexion and extension of the back. *Id.* He refilled Naproxen and Oxycodone for back pain and encouraged Plaintiff to engage in low back exercises and to continue in his weight loss efforts. *Id.*

Plaintiff presented to Leah H. Stem, M.D. ("Dr. Stem"), to discuss his blood pressure medication on January 9, 2018. Tr. at 368. He reported feeling "worn out," as his father had recently suffered a stroke, was living with him,

and required assistance with activities of daily living ("ADLs"). *Id.* He indicated his back pain had been exacerbated as he was lifting more. *Id.* His blood pressure was elevated at 182/99 mmHg and he weighed 322.4 pounds. Tr. at 369. Dr. Stem noted normal findings on exam. *Id.* She discussed limiting Plaintiff's use of NSAIDs based on their potential negative impact on hypertension. *Id.* She refilled Amlodipine Besylate for hypertension, Omeprazole for GERD, and Oxycodone HCl for chronic pain. *Id.*

Plaintiff followed up for medication refills on February 12, 2018. Tr. at 364. Dr. Burk noted Plaintiff had lost eight pounds since his last visit. *Id.* Plaintiff's blood pressure was elevated at 159/81 mmHg and he reported increased stress due to his father's death. Tr. at 364, 365. Dr. Burk observed limited ROM, paralumbar and SI joint tenderness, and pain with flexion and extension of the back. Tr. at 365. He refilled Oxycodone, Carvedilol, Omeprazole, and Crestor. Tr. at 366.

On March 13, 2018, Plaintiff presented with an ingrown toenail on his left great toe and for follow up as to hypertension, obesity, and chronic lower back pain. Tr. at 360. His blood pressure was initially elevated, but decreased to a controlled range while he was in the office. *Id.* His weight had increased to 318.8 pounds. Tr. at 360, 361. Dr. Burk observed limited musculoskeletal ROM, paralumbar and SI joint tenderness, pain with flexion and extension of the back, no musculoskeletal swelling or erythema, and an ingrown toenail to

13

the medial aspect of the left great toe. Tr. at 361. He refilled Crestor and Oxycodone and referred Plaintiff for a diabetic eye exam and a screening colonoscopy. Tr. at 362.

On April 13, 2018, Plaintiff reported his pain medication lasted for a couple of hours and that he was taking three to four tablets per day. Tr. at 356. He said his pain was worse in the morning than the evening and described jerking of his arms and legs. *Id.* He indicated he had stopped drinking soda, but was drinking a lot of lemonade instead. *Id.* He endorsed some depression. Tr. at 357. He weighed 317.4 pounds. *Id.* Ryan H. Ban, M.D. ("Dr. Ban"), indicated normal findings on exam, aside from obesity. *Id.* He refilled Oxycodone HCl and Crestor and instructed Plaintiff to focus on losing five pounds a month, as weight loss surgery was not an option. Tr. at 358. He instructed Plaintiff to stop using Flexeril, Naproxen, Gabapentin, Clobetasol Propionate ointment, Bactrim DS, Mupirocin ointment, Coreg CR, Potassium Chloride ER, Carvedilol, and aspirin, noting Plaintiff was no longer taking several of the medications. *Id.*

Plaintiff complained of an ingrown left great toenail and requested medication refills on May 22, 2018. Tr. at 352. He requested the toenail be excised. *Id.* Dr. Burk noted Plaintiff's hemoglobin A1c was 6.5% and he was doing well on his diabetes regimen. *Id.* He indicated Plaintiff was working on weight loss to address back pain and his weight had decreased by four

pounds. *Id.* Dr. Burk observed central obesity, limited musculoskeletal ROM, paralumbar tenderness, bilateral SI joint tenderness, pain with flexion and extension of the back, no musculoskeletal swelling or erythema, and an ingrown toenail to the medial aspect of the left great toe with mild swelling, erythema, and a small amount of purulent drainage. Tr. at 353–54. He prescribed Spironolactone 25 mg for hypertension and Doxycycline Hyclate 100 mg for ingrown toenail, refilled Oxycodone HCl 10 mg for lumbago, and indicated Plaintiff should continue his weight loss goal of five pounds per month. Tr. at 354.

On July 2, 2018, Dr. Burk noted that Plaintiff had missed an appointment for treatment of an ingrown toenail, but that it was improving slowly with self-trimming, soaking in Epsom salt, and keeping it clean. Tr. at 348. He stated Plaintiff's diabetes was controlled on his current regimen. *Id.* He noted Plaintiff had not lost weight on his own, but would prefer to avoid bariatric surgery. *Id.* Plaintiff complained of worsened lumbar back pain following increased activity at home. *Id.* He described morning weakness in his bilateral lower extremities that improved upon standing and stretching. *Id.* He weighed 310.6 pounds. Tr. at 349. Dr. Burk observed limited ROM in Plaintiff's lumbar spine, paralumbar tenderness, no swelling or erythema, no notable weakness on lower extremity exam, improving ingrown left great toenail, bilateral SI joint tenderness, and pain with flexion and extension of

the back. Tr. at 349–50. He refilled Oxycodone for pain and Gabapentin for polyneuropathy, prescribed Bupropion HCl 100 mg for weight loss, and referred Plaintiff for an MRI of the lumbar spine and a screening colonoscopy. Tr. at 350.

On August 17, 2018, Plaintiff followed up with Michael J. Solomon, M.D. ("Dr. Solomon"), for management of hypertension, diabetes, obesity, and chronic pain. Tr. at 345. He reported his pain was controlled on his current regimen, but noted increased numbness down his left leg. Tr. at 345. Dr. Solomon indicated Plaintiff had lost nearly 20 pounds since he started Victoza. *Id.* Plaintiff's blood pressure was controlled at 119/69 mmHg and he weighed 304.6 pounds. Tr. at 346. Dr. Solomon recorded normal findings on physical exam. *Id.* He assessed benign essential hypertension, type 2 diabetes without complication, epidural lipomatosis, spinal stenosis at L4–5, morbid obesity, and GERD. *Id.* He refilled Plaintiff's medications and indicated he would attempt to increase Victoza for weight management if Plaintiff could tolerate it. *Id.*

In an undated letter, Dr. Burk noted he had been seeing Plaintiff for over a year. Tr. at 341. He wrote:

> It is my medical opinion that his known medical conditions (lumbar degenerative disc disease and foraminal stenosis proven on imaging in 2016) cause severe and debilitating back pain that keeps him from performing many routine activities. Patient is unable to lift heavy objects without worsening pain. He has been very faithful in following up on his medical conditions and does

16

well with his medical therapies. He is currently undergoing appropriate evaluation by specialists and further imaging to help address the etiology of his pain.

*Id.*

C.    The Administrative Proceedings

1.    The Administrative Hearing

a.    Plaintiff's Testimony

At the hearing on August 28, 2018, Plaintiff testified he had a driver's license and drove two to three times per week to pay bills and pick up his grandchildren from school. Tr. at 35. He stated he lived with his wife who did not work outside the home. Tr. at 36. He indicated he could read and perform simple math. *Id.* He said he last performed construction work in 2013 because of his pain and depression. Tr. at 36–37.

Plaintiff testified he was unable to work because he could not pick up items or perform a job to meet an employer's expectations. Tr. at 37. He said his medication made him drowsy and his leg went numb if he walked for more than 30 to 40 minutes. *Id.* He stated he felt depressed because he could no longer provide for himself and his wife. *Id.* He denied having undergone back surgery and said he last received injections to his back in 2005 or 2006. Tr. at 38. He indicated the injections had provided pain relief for seven to 10 days and had caused him to have to visit the bathroom more frequently. Tr. at 38–39. He noted he had participated in three or four rounds of physical

therapy, as recently as the prior year. Tr. at 39. He indicated he continued to perform the home exercises he learned in physical therapy every other day. *Id.* He stated his pain was worse when the weather was bad. *Id.* He said he was taking Naproxen, Oxycodone, and Gabapentin for pain. Tr. at 40. He noted he used Oxycodone four times a day. *Id.* He said he felt paralyzed from the waist down when he woke each morning. *Id.* He described his hands rising above his head in a motion he could not control. Tr. at 40–41. He admitted a hot shower reduced his stiffness. Tr. at 41.

Plaintiff indicated his wife babysat for their two- and five-year-old grandchildren daily. Tr. at 38. He said she would typically prepare his breakfast after he showered, and he would eat and take his medicine. Tr. at 41. He indicated he would subsequently walk around his yard and watch his dog. *Id.* He said he felt dizzy once his medication kicked in, such that he had to come in and sit down. *Id.* He stated his leg would grow numb if he walked for too long. *Id.*

Plaintiff estimated he could stand for an hour or less and sit for an hour. Tr. at 41–42. He said he had not taken his medication that morning because he needed to drive to the hearing. Tr. at 42. He estimated he could walk for 30 to 45 minutes prior to needing to sit down. *Id.*

Plaintiff testified he enjoyed fishing as a hobby and had last been fishing around his birthday in March. Tr. at 43. He said he enjoyed cooking,

but had difficulty standing at the stove to cook. *Id.* He explained that he had performed the household chores when his wife worked, but that she did most of the chores since she was no longer working. *Id.* He said he could sweep for about five minutes prior to experiencing increased back pain. *Id.* He indicated he could pick up light items, but did not do laundry or help in the kitchen. Tr. at 44.

Plaintiff indicated his doctor had prescribed medication for depression, but he did not like the way it made him feel. *Id.* He denied having participated in therapy. *Id.* He said he dealt with his depression through daily prayer. *Id.*

Plaintiff testified that Dr. Burk was one of his primary treating physicians. Tr. at 45. He stated his pain affected his ability to bend and pick up items and caused tightness and numbness in his legs. Tr. at 46. He said he experienced pain every day. *Id.* He indicated the pain in his legs was particularly severe because of the cloudy weather. Tr. at 47. He noted his doctor had not recommended surgery because he felt that he would not get significant relief and would require additional surgery. *Id.* He said he would work if he were not in so much pain. Tr. at 48.

      b.    Vocational Expert Testimony

Vocational Expert ("VE") Ashley Harrelson Johnson reviewed the record and testified at the hearing. Tr. at 49–55. The VE categorized

Plaintiff's PRW as a form carpenter, *Dictionary of Occupational Titles* ("*DOT*") number 860.381-046, as requiring heavy exertion with a specific vocational preparation ("SVP") of 7, and a construction worker, I, *DOT* number 869.664-014, as requiring heavy exertion with an SVP of 4. Tr. at 49. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform work at the light exertional level with frequent climbing of ramps and stairs; no climbing of ladders, ropes, or scaffolds; and no concentrated exposure to hazards. Tr. at 49–50. The VE testified the hypothetical individual would be unable to perform Plaintiff's PRW. Tr. at 50. The ALJ asked whether there were any other jobs the hypothetical person could perform. *Id.* The VE identified light jobs with an SVP of 2 as an inspector and hand packager, *DOT* number 559.687-074, a small parts assembler, *DOT* number 706.684-022, and an electronics worker, *DOT* number 726.687-010, with 338,000, 92,000, and 41,000 positions in the economy, respectively. *Id.*

For a second hypothetical question, the ALJ asked the VE to consider a hypothetical individual of Plaintiff's vocational profile who was limited to sedentary work with the same additional restrictions in the first hypothetical question. Tr. at 51. The ALJ asked if the individual could perform Plaintiff's PRW. *Id.* The VE testified he could not. *Id.* The ALJ asked if there were other jobs in the economy the individual could perform. *Id.* The VE identified

sedentary jobs with an SVP of 2 as a document preparer, *DOT* number 249.587-018, a weight checker, *DOT* number 737.687-026, and a final assembler, *DOT* number 713.687-018, with 104,000, 14,000, and 7,000 positions in the economy, respectively. *Id.*

In framing a third hypothetical question, the ALJ asked the VE to consider an individual of Plaintiff's vocational profile who could perform sedentary work with frequent climbing of stairs; no climbing of ladders, ropes, or scaffolds; no concentrated exposure to hazards; and simple, routine, and repetitive tasks. *Id.* He asked if the individual could perform Plaintiff's PRW. *Id.* The VE responded he could not. *Id.* The ALJ asked if Plaintiff had acquired any transferable skills to jobs at the sedentary exertional level. Tr. at 52. The VE testified he would have no transferable skills. *Id.*

Plaintiff's attorney asked the VE to consider the restrictions in the first hypothetical question and to further assume the individual would be off-task for 10 percent of the workday due to constant, chronic pain. *Id.* The VE stated being off-task for 10 percent of the workday would generally be tolerated, but any greater time off-task would not. *Id.*

Plaintiff's attorney alternatively asked the VE to consider the hypothetical individual would miss work on three-to-four days per month. Tr. at 53. He asked if there would be jobs the individual could perform. *Id.* The

VE testified the individual would be unable to perform any jobs in the economy. *Id.*

Plaintiff's attorney asked if the jobs of inspector, weight checker, and final assembler, as previously identified, would be eliminated if the hypothetical individual were limited to lifting 5.5 pounds. Tr. at 54. The VE testified they would. Tr. at 55.

### 2.    The ALJ's Findings

In her decision dated January 28, 2019, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant last met the insured status requirements of the Social Security Act on December 31, 2016.
2.    The claimant did not engage in substantial gainful activity during the period from his alleged onset date of January 1, 2007 through his date last insured of December 31, 2016 (20 CFR 404.1571 *et seq.*).
3.    Through the date last insured, the claimant had the following severe impairments: lumbar degenerative disc disease (DDD) and obesity (20 CFR 404.1520(c)).
4.    Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).
5.    After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b), with the following additional limitations. He could frequently climb stairs and ramps, but never climb ladders, ropes, or scaffolds. He had to avoid concentrated exposure to hazards.
6.    Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

7.    The claimant was born on March 13, 1964 and was 52 years old, which is defined as an individual closely approaching advanced age, on the date last insured (20 CFR 404.1563).

8.    The claimant has a limited education and is able to communicate in English (20 CFR 404.1564).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferrable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.   Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569a).

11.   The claimant has not been under a disability, as defined in the Social Security Act, at any time from January 1, 2007, the alleged onset date, through December 31, 2016, the date last insured (20 CFR 404.1520(g)).

Tr. at 12–18.

II.    Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)    the ALJ failed to fully evaluate whether Plaintiff's impairment met or equaled Listing 1.04;

2)    the ALJ did not properly consider Plaintiff's subjective symptoms; and

3)    the ALJ did not adequately explain her findings as to Plaintiff's RFC.

The Commissioner counters that substantial evidence supports the ALJ's findings and that she committed no legal error in her decision.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether he has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[3] (4)

---

[3] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20

whether such impairment prevents claimant from performing PRW;[4] and (5) whether the impairment prevents him from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

---

C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[4] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146. n.5 (1987) (regarding burdens of proof).

### 2.     The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*, *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d

287, 290 (4th Cir. 2002) (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

1.    Listing 1.04

Plaintiff argues the ALJ did not properly consider symptoms, signs, and laboratory findings consistent with a finding of disability under

paragraph A of Listing 1.04. [ECF No. 19 at 15]. He maintains the record contained diagnostic evidence of nerve root compression; he consistently reported a neuro-anatomic distribution of pain; he had positive SLR testing; and he demonstrated limited ROM of the spine, muscle weakness, and sensory or reflex loss. *Id.* at 16. He contends the ALJ appears to have rejected a finding of disability under Listing 1.04 because he did not have all signs and symptoms at the same time, which the Fourth Circuit has explicitly held the Listing does not require. *Id.* at 16–17.

The Commissioner argues the ALJ appropriately concluded Plaintiff was not disabled at step three. [ECF No. 21 at 10]. He maintains Plaintiff's impairments did not meet Listing 1.04 because he had normal sensation, normal motor strength, and intact reflexes and the record does not indicate whether SLR testing was performed in both the seated and supine positions. *Id.* at 12.

At the third step of the sequential evaluation process, the ALJ must identify relevant listings and compare their medical criteria with the symptoms, signs, and laboratory findings of the claimant's impairments, as shown in the medical evidence. *Cook v. Heckler*, 783 F.3d 1168, 1173 (4th Cir. 1986); 20 C.F.R. § 416.908.

For a presumption of disability to apply based on paragraph A of Listing 1.04, the claimant must have a disorder of the spine (e.g., herniated

nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, DDD, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord with evidence of nerve root compression characterized by: (1) neuro-anatomic distribution of pain; (2) limitation of motion of the spine; (3) motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss; and (4) if there is involvement of the lower back, positive SLR test (sitting and supine). 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 1.04(A).

The claimant bears the burden of proving that his impairment meets the listing. *Henderson v. Colvin*, 643 Fed. App'x 273, 276 (4th Cir. 2016) (citing *Kellough v. Heckler*, 785 F.2d 1147, 1152 (4th Cir. 1986)); *see also Monroe v. Colvin*, 826 F.3d 176, 179 (4th Cir. 2016) ("At the third step, the burden remains on the claimant, *see Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995), and he can establish his disability if he shows that his impairments match a listed impairment, *see Mascio*, 780 F.3d at 634–35."). "For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990).

The ALJ assessed lumbar DDD as a severe impairment. Tr. at 13. She considered it under Listing 1.04, writing the following: "I do not find that the record as a whole shows the claimant's nerve root compression to have been

severe enough to be characterized by all the criteria in 1.04A on a continuous durational basis." Tr. at 14. She further determined there was "not evidence of arachnoiditis as described in 1.04B" and Plaintiff "was not unable to ambulate effectively, as required to satisfy 1.04C." *Id.* Thus, she concluded Plaintiff's impairment did not meet or equal Listing 1.04. *Id.*

In *Radford v. Colvin*, 734 F.3d 288, 294 (4th Cir. 2013), the court explained:

> We hold that Listing 1.04A requires a claimant to show only what it requires him to show: that each of the symptoms are present, and that the claimant has suffered or can be expected to suffer from nerve root compression continuously for at least 12 months. 20 C.F.R. § 404.1509. A claimant need not show that each symptom was present at precisely the same time—i.e. simultaneously—in order to establish the chronic nature of this condition. Nor need a claimant show that the symptoms were present in the claimant in particularly close proximity.

Given the Fourth Circuit's holding in *Radford*, the ALJ's step three rationale is flawed in that she found Plaintiff's impairment did not meet paragraph A of Listing 1.04 because he did not meet all the criteria on a continuous basis. *See* Tr. at 14. Despite this error, "[t]he ALJ's decision must be read as a whole in determining whether the ALJ has provided 'a coherent basis' for the step three determination." *Mercer v. Saul*, C/A No. 6:18-2915-JMC-KFM, 2019 WL 8953201 at *10 (D.S.C. Oct. 22, 2019), adopted by 2020 WL 1080443 (Mar. 6, 2020) (citing *Keene v. Berryhill*, 173 F. App'x 174, 177 (4th Cir. 2018)).

In explaining the RFC assessment, the ALJ acknowledged the presence of some of the criteria required to meet Listing 1.04A. She recognized Plaintiff's "[b]ack range of motion (ROM) has been limited." Tr. at 16. She noted "[s]traight leg raising (SLR) has been positive bilaterally."[5] *Id.* She explained "a March 2016 lumbar MRI showed, among other results, moderate to severe foraminal stenosis with compression of the left L3 nerve root, and moderate to severe facet arthropathy. (Exs. 3F/2; 10F/44). *Id.* However, she

---

[5] The Commissioner argues the SLR tests in the record do not satisfy the requirement in paragraph A of Listing 1.04 that the test be performed both in the seated and supine positions. [ECF No. 21 at 10]. This court has previously held that the record must contain evidence that the testing was performed in both positions to support a finding that the claimant's impairment is meets the Listing. *See, e.g., Gardner v. Colvin*, C/A No. 0:15-1123-RBH, 2016 WL 4445375 at *7 (D.S.C. Aug. 24, 2016) (finding the ALJ's decision was supported by substantial evidence where the plaintiff had not "exhibited the requisite positive straight leg-raising tests in both the sitting and supine positions or sufficient motor, sensory, and reflex loss"); *Norris v. Saul*, C/A No. 9:18-2973-DCN, 2020 WL 255703 at *4 (D.S.C. Jan. 17, 2010) ("The plain language of Listing 1.04A requires evidence of a positive test in both the sitting <u>and</u> supine positions.") (emphasis in original)). However, the ALJ did not reject the SLR test as not being performed in both the seated and supine positions. Instead, she acknowledged "[s]traight leg raising (SLR) ha[d] been positive bilaterally," indicating she accepted the SLR tests as consistent with the requirements in the listing. The court cannot accept an alternate explanation from the Commissioner's counsel especially where, as here, it conflicts with the ALJ's actual finding. *See Robinson ex rel. M.R. v. Comm'r of Soc. Sec.*, No. 0:07-3521-GRA, 2009 WL 708267, at *12 (D.S.C. 2009) citing *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) ("[P]rinciples of agency law limit this Court's ability to affirm based on post hoc rationalizations from the Commissioner's lawyers . . . '[R]egardless [of] whether there is enough evidence in the record to support the ALJ's decision, principles of administrative law require the ALJ to rationally articulate the grounds for [her] decision and confine our review to the reasons supplied by the ALJ.'").

stated "sensation has been normal, and strength/motor function has been generally normal." *Id.*

The court has considered whether substantial evidence supports the ALJ's finding that Plaintiff had normal strength, sensation, and motor functioning such that there was no evidence of motor loss accompanied by sensory or reflex loss. Plaintiff references treatment records he claims to support the presence of muscle weakness. ECF No. 19 at 16 (citing Tr. at 310, 329, 333, 348). However, Plaintiff's strength was observed to be 5/5 or to show "no notable weakness" during all, but one, of these visits. *See* Tr. at 334, 330, 349. On November 30, 2015, Dr. Strickland noted "4/5 right hip flexion; lower extremities otherwise 5/5 throughout." Tr. at 310. In *Henderson v. Colvin*, 643 F. App'x 273, 276 (4th Cir. 2016), an unpublished opinion, the Fourth Circuit held that the ALJ properly determined that the plaintiff did not meet Listing 1.04 where he produced evidence of muscle weakness, decreased reflexes, and positive SLR tests, but produced no evidence of atrophy and the only evidence of muscle weakness was "a lone clinical finding that his leg strength was 4+/5." The court determined the singular finding of muscle weakness "fail[ed] to undercut the substantial conflicting evidence in the record that his strength was consistently '5/5,' 'stable,' or 'normal.'" *Id.* Similarly, in this case, Plaintiff's providers documented 5/5 or normal

strength during all but one visit. *See* Tr. at 313, 316, 318, 330, 334, 349, 375, 378, 382.

Listing 1.04 cannot be met "[a]bsent evidence of sensory or reflex loss." *Mercer*, 2020 WL 1080443 at *4. Plaintiff maintains the treatment records contain evidence of sensory and reflex loss. ECF No. 19 at 16 (citing 329, 333, 345). These records do not reflect Plaintiff's providers' observations of sensory or reflex loss, but instead show his complaints of sensory or reflex loss. *See* Tr. at 329 (describing weakness in his legs with numbness on the outside of his thighs), 333 (indicating his back pain radiated down his thighs to his knees and was associated with numbness in the same distribution), 345 ("reporting some increase in numbness down his left leg"). Plaintiff's reported symptoms are not sufficient to prove the existence of the signs necessary to meet the listing. *See Backman v. Colvin*, C/A No. 4:12-1897-TER, 2014 WL 798356 at *6 (D.S.C Feb. 27, 2014) (finding the plaintiff's self-reported statements were insufficient to meet of equal the listing criteria where much of the evidence the plaintiff identified as meeting the listing were her doctors' notations of her subjective reports) (citing SSR 96-5p, 1996 WL 374183 at *3 (requiring objective signs and laboratory findings to meet listings criteria)); 20 C.F.R. § 404.1529(d) (providing that in assessing equivalency to a listing, the Social Security Administration ("SSA") "will not substitute [the claimant's] allegations of pain or other symptoms for a missing or deficient

sign or laboratory finding to raise the severity of [his] impairment to that of a listed impairment"). During one of the exams at which Plaintiff presented with complaints of numbness, Dr. Varma noted 2+ symmetric reflexes. Tr. at 334. Although he indicated "impaired sensation" in the right leg, he noted Plaintiff had received a skin graft at the site, which had presumably caused the impaired sensation. *See* Tr. at 335. NP Brothers and Dr. Solomon failed to document any findings as to sensation or reflexes during the other two physical exams associated with the complaints Plaintiff referenced. *See* Tr. at 330, 346. Thus, Plaintiff has failed to provide evidence of sensory or reflex loss necessary to meet Listing 1.04.

Because the record includes only one reference to decreased strength and no evidence of sensory or reflex loss, substantial evidence supports the ALJ's finding that Plaintiff's impairment did not meet or equal the requirements in paragraph A of Listing 1.04.

### 2.     Subjective Symptom Evaluation

Plaintiff argues the ALJ erred in rejecting his subjective allegations given evidence of limited ROM, lumbar tenderness, positive SLR, moderate-to-severe foraminal stenosis with compression of the left L3 nerve root, and moderate-to-severe facet arthropathy. [ECF No. 19 at 18, 20]. He maintains the ALJ's reliance on his failure to receive injections, participate in physical therapy, or undergo surgery over the relevant period ignores the fact that

those treatments had failed to provide relief in the past. *Id.* He contends the ALJ considered his failure to lose weight as evidence of noncompliance without undertaking the proper analysis as to noncompliance. *Id.* at 18–19. He claims the ALJ failed to specify which of his statements she credited and which she rejected. *Id.* at 19.

The Commissioner argues the ALJ provided specific reasons in accordance with SSR 16-3p to support her findings that Plaintiff's statements were not consistent with the medical and other evidence. *Id.* at 12–13. He maintains the ALJ explained which of Plaintiff's alleged limitations were supported by the evidence and which were not. *Id.* at 13. He contends the ALJ considered the objective medical evidence, Plaintiff's conservative treatment, his continued employment over the relevant period, and the state agency consultants' opinions. *Id.* at 13–14. He claims the ALJ explained how she accounted for Plaintiff's impairments in the RFC assessment. *Id.* at 14.

A claimant's statements are among the evidence the ALJ must consider and reconcile with her RFC assessment. "[A]n ALJ follows a two-step analysis when considering a claimant's subjective statements about impairments and symptoms." *Lewis v. Berryhill*, 858 F.3d 858, 865–66 (4th Cir. 2017) (citing 20 C.F.R. § 404.1529(b), (c)). "First, the ALJ looks for objective medical evidence showing a condition that could reasonably produce the alleged symptoms." *Id.* at 866 (citing 20 C.F.R. § 404.1529(b)). The ALJ

35

only proceeds to the second step if the claimant's impairments could reasonably produce the symptoms he alleges. *Id.* At the second step, the ALJ is required to "evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit [his] ability to perform basic work activities." *Id.* (citing 20 C.F.R. § 404.1529(c)). She must "evaluate whether the [claimant's] statements are consistent with objective medical evidence and the other evidence." SSR 16-3p, 2016 WL 1119029, at *6. However, she is not to evaluate the claimant's symptoms "based solely on objective medical evidence unless that objective medical evidence supports a finding that the individual is disabled." *Id.* at *4; *see also Arakas v. Commissioner, Social Security Administration*, 983 F.3d 83, 98 2020 (4th Cir. 2020) ("We also reiterate the long-standing law in our circuit that disability claimants are entitled to rely exclusively on subjective evidence to prove the severity, persistence, and limiting effects of their symptoms.").

In evaluating the alleged limiting effect of a claimant's symptoms, the ALJ is to consider other evidence that "includes statements from the individual, medical sources, and any other sources that might have information about the individual's symptoms, including agency personnel, as well as the factors set forth in [the] regulations." SSR 16-3p, 2016 WL 1119029, at *5; *see also* 20 C.F.R. § 404.1529(c) (listing factors to consider,

such as ADLs; the location, duration, frequency, and intensity of pain or other symptoms; any measures other than treatment an individual uses or has used to relieve pain or other symptoms; and any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms).

Pursuant to SSR 16-3p, the ALJ must explain which of the claimant's symptoms she found "consistent or inconsistent with the evidence in [the] record and how [her] evaluation of the individual's symptoms led to [her] conclusions." 2016 WL 1119029, at *8. She must evaluate the "individual's symptoms considering all the evidence in his or her record." *Id.*

The ALJ found that Plaintiff's medically-determinable impairments could reasonably be expected to cause the symptoms he alleged, but concluded his statements concerning the intensity, persistence, and limiting effects of his symptoms were not entirely consistent with the evidence in the record. Tr. at 15. In considering the objective medical evidence, the ALJ acknowledged limited ROM of the back, lumbar tenderness, positive bilateral SLR test, normal sensation, normal strength/motor function, and normal gait and balance. Tr. at 16. She cited imaging results that included February 2016 x-rays showing mild-to-moderate findings and a March 2016 MRI showing moderate-to-severe foraminal stenosis with compression of the left L3 nerve root and moderate-to-severe arthropathy. *Id.* She noted Plaintiff's BMI in the

mid-40s. *Id.* She concluded the objective medical evidence was "not entirely consistent" with Plaintiff's allegations. *Id.*

The ALJ noted Plaintiff had received conservative treatment, as the record lacked evidence of injections or physical therapy and surgery had not been recommended. *Id.* She consider Plaintiff's failure to lose weight "not inherently inconsistent with his allegations," but stated "the absence of any documented attempt to do so suggest[ed] that his symptoms [were] not as intense or limiting as he allege[d]." *Id.* She acknowledged that Plaintiff had reported "significant limitations" in his ADLs. *Id.* She indicated Plaintiff had "worked after the alleged onset date." Although she acknowledged that the "work did not preclude further consideration of his claim," she deemed it "a further point of inconsistency." *Id.* She gave partial weight to Dr. Burk's opinion and the opinions of the state agency medical consultants. Tr. at 16–17. She considered Dr. Burk's characterization of Plaintiff's pain as "debilitating" to be an opinion on an issue reserved to the Commissioner and his indication that Plaintiff could not perform "many routine activities" to be vague in some respects. Tr. at 16.

Although the ALJ considered some of Plaintiff's allegations, her decision does not reflect a thorough evaluation of his statements. She briefly noted the symptoms Plaintiff reported in function reports and his hearing testimony, Tr. at 15–16, but she did not discuss any individual treatment

records or consider whether Plaintiff's reports to the SSA were consistent with his reports to his medical providers. Pursuant to SSR 16-3p, 2017 WL 5180304, at *6:

> An individual's statements may address the frequency and duration of the symptoms, the location of the symptoms, and the impact of the symptoms on the ability to perform daily living activities. An individual's statements may also include activities that precipitate or aggravate the symptoms, medications and treatments used, and other methods used to alleviate the symptoms. We will consider an individual's statements about the intensity, persistence, and limiting effects of symptoms, and we will evaluate whether the statements are consistent with objective medical evidence and the other evidence.

Plaintiff's statements to his providers addressed the location and impact of his pain and the activities that exacerbated it. He described throbbing lower right-sided back pain that radiated to his right buttocks and interrupted his sleep when he visited Dr. Jones in March 2012. Tr. at 296. When he presented to NP Sanchez in September 2012, he described severe, throbbing back pain that interrupted his sleep and for which Flexeril was no longer effective. Tr. at 293. On October 20, 2014, Plaintiff complained to Dr. Reppert of a sore back and reported limited activity due to pain and radiation to the right lateral thigh. Tr. at 312. In March 2015, he complained to Dr. Porter of weakness and shooting pain down both legs and indicated he felt as if his back pain were worsening. Tr. at 315. On November 30, 2015, Plaintiff reported to Dr. Strickland and endorsed low back pain with weakness and radicular pain to his right leg that was keeping him up at night. Tr. at 310.

He said he had previously worked 12-hour days, but could only work three because of his pain. *Id.* In June 2016, Plaintiff described lower back pain that radiated to his bilateral hips and legs and caused aching and weakness in his legs and numbness in his thighs. Tr. at 329. Later that month, he described pain that radiated down the lateral aspect of both thighs to the knees, was worse on the right, and was associated with numbness, right leg weakness, and aggravation upon walking, bending, and sitting for long periods. Tr. at 333. On December 6, 2017, Plaintiff indicated his back pain was worse than usual and was affecting his sleep. Tr. at 371. He said he was performing "tile work" with his son that might be exacerbating his pain and was occasionally walking on a treadmill, although his back pain prevented him from doing more. *Id.* Plaintiff also reported exacerbations of back pain associated with "lifting more" in January 2018 and increased activity at home in July 2018. *See* Tr. at 348, 368.

The ALJ only considered this evidence to the extent that she noted Plaintiff's work activity was inconsistent with his allegations. However, "[a]n ALJ may not consider the *type* of activities a claimant can perform without also considering the *extent* to which she can perform them." *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018) (emphasis in original) (citing *Brown v. Commissioner*, 873 F.3d 251, 263 (4th Cir. 2017). The ALJ erred to the extent that she considered Plaintiff's work activity without having

40

considered the limited time he spent working and that his work activity tended to exacerbate his pain.

Although the record does not contain treatment notes from physical therapy sessions or injections during the relevant period, it appears these treatment methods were used, despite the ALJ's indications to the contrary. Plaintiff reported in November 2015 that he was receiving no benefit from physical therapy, which indicates he had been undergoing physical therapy prior to the visit. *See* Tr. at 310. He complained during a June 2016 visit with NP Brothers that he had reduced ability to hold his urine since receiving injections, suggesting he had received prior injections. *See* Tr. at 329. In addition, Plaintiff reported to Dr. Varma in June 2016 that he had participated in physical therapy that was unsuccessful and had received 10 to 15 steroid injections that had alleviated his pain for only a week or two at a time. Tr. at 333. Given the ALJ's error in evaluating the type of treatment Plaintiff had received, her reliance on his conservative treatment history to reject some of his subjective allegations is misplaced.

The ALJ also failed to engage in the necessary inquiry prior to discounting Plaintiff's subjective allegations based on perceived noncompliance with recommendations for weight loss. To disqualify "an otherwise eligible Social Security claimant from benefits for noncompliance," the ALJ must "conduct a 'particularized inquiry' to demonstrate that the

claimant's condition is 'reasonably remediable' by compliance with prescribed treatment." *Pringle v. Astrue*, C/A No. 4:11-2152-RMG, 2013 WL 442256 at *6 (D.S.C. Feb. 5, 2013) (citing *Preston v. Heckler*, 769 F.2d 988, 990 (4th Cir. 1985)). "This means that with compliance Plaintiff could return to work." *Id.* (citing *Rousey v. Heckler*, 771 F.2d 1065, 1069 (7th Cir. 1985). The ALJ must also "demonstrate that the claimant lacked 'good cause for failing to follow a prescribed treatment plan.'" *Id.* (citing *Preston*, 769 F.2d at 991).

Although the ALJ noted that Plaintiff's providers had recommended weight loss as a means for reducing pain related to nerve-root compression and arthropathy, she did not specifically indicate that any of Plaintiff's providers had suggested weight loss would alleviate his symptoms such that he would be able to return to work. In addition, the ALJ ignored evidence that suggested Plaintiff had good cause for failing to accomplish weight loss through exercise, as his back pain increased with walking on a treadmill and engaging in increased activity. *See* Tr. at 348, 371. Finally, the ALJ ignored evidence that Plaintiff was attempting to comply with the recommendation for weight loss. *See* Tr. at 345 (noting Plaintiff had lost 20 pounds after his diabetes medication was properly adjusted), Tr. at 371 (stating he had reduced his sugar and soda consumption), Tr. at 374 (indicating he was exercising and reducing portion sizes).

1:20-cv-01288-SVH     Date Filed 02/01/21     Entry Number 22     Page 43 of 47

The ALJ discussed Plaintiff's statements as to the intensity, persistence, and limiting effects of his symptoms in a conclusory manner and provided a flawed explanation to support her decision to discount his allegations. Therefore, the undersigned finds substantial evidence does not support the ALJ's evaluation of Plaintiff's subjective allegations.

3.     RFC Assessment

Plaintiff argues the ALJ did not explain his RFC assessment as required by SSR 96-8p. [ECF No. 19 at 11]. He maintains the ALJ failed to explain why she rejected the state agency consultants' opinions that Plaintiff was limited to occasional stooping, kneeling, crouching, and crawling as unsupported by the evidence when the evidence showed limited ROM of the lumbar spine, decreased ROM at the waist, pain with flexion and extension, and positive SLR tests. *Id.* at 13.

The Commissioner argues the ALJ appropriately explained her RFC finding. [ECF No. 21 at 8]. He maintains the ALJ addressed Plaintiff's impairments and included functional limitations to address them in the RFC assessment. *Id.* at 9–10.

The ALJ must consider all the relevant evidence and account for all of the claimant's medically-determinable impairments in the RFC assessment. *See* 20 C.F.R. § 404.1545(a). She must include a narrative discussion describing how all the relevant evidence supports each conclusion and must

cite "specific medical facts (e.g., laboratory findings) and non-medical evidence (e.g., daily activities, observations)." SSR 96-8p, 1996 WL 374184 at *7. She must explain how she resolved any material inconsistencies in the record. SSR 16-3p, 2016 WL 1119029, at *7. "[A] proper RFC analysis has three components: (1) evidence, (2) logical explanation, and (3) conclusion. *Thomas v. Berryhill*, 916 F.3d 307, 311 (4th Cir. 2019).

Medical opinions are among the evidence that must be considered in assessing a claimant's RFC. *See* 20 C.F.R. § 404.1527(b) ("In determining whether you are disabled, we will always consider the medical opinions in your case record together with the rest of the relevant evidence we receive."). Because Plaintiff's application for benefits was filed prior to March 27, 2017, the ALJ was to evaluate the medical opinions based on the factors in 20 C.F.R. § 404.1527(c), which include "(1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist." *Johnson*, 434 F.3d at 654 (citing 20 C.F.R. § 404.1527(c)); *see also* 20 C.F.R. § 404.1520c (stating "[f]or claims filed before March 27, 2017, the rules in § 404.1527 apply).

"[R]emand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory

evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (citing *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013)).

The ALJ cited the objective evidence, the state agency consultants' opinions, and Dr. Burk's opinion[6] as supporting her RFC assessment. Tr. at 16–17. She discussed the relevant factors in 20 C.F.R. § 404.1527(c) in explaining her allocation of partial weight to the state agency medical consultants' opinions. Tr. at 17. She recognized that the medical consultants were "non-treating, non-examining sources who, however, possess extensive program knowledge." *Id.* She noted "significant abnormal clinical signs, such as limited back ROM and positive SLR," as well as "normal findings, like normal strength/motor function and normal gait." *Id.* She acknowledged "moderate to severe findings on the March 2016 MRI" and Plaintiff's body mass index ("BMI") in the mid-40s. *Id.* However, she stated his evidence contrasted with Plaintiff's conservative treatment history. *Id.* She wrote:

> I find these consultants' proposed exertional and climbing limitations to be consistent with and supported by these considerations, which fairly summarize the medical evidence of record, and I have adopted those proposed limitations in the residual functional capacity assessment above. However, I do not find that these evidentiary considerations support the other proposed postural limitations, and so I have not adopted them here.

---

[6] The ALJ considered Dr. Burk's indication that Plaintiff could not "lift heavy objects," as consistent with the exertional demands of light work. *See* Tr. at 17.

*Id.*

The ALJ failed to explain—based on this evidence—how she determined Plaintiff could perform light work requiring frequent climbing of ramps and stairs; no climbing of ladders, ropes, or scaffolds; and should avoid concentrated exposure to hazards. She did not explain how a conservative treatment history and normal strength, motor function, and gait showed Plaintiff could meet the demands of this work given a BMI consistent with morbid obesity, evidence of moderate-to-severe foraminal stenosis with compression of the left L3 nerve root and moderate-to-severe arthropathy, positive SLR, and decreased lumbar ROM. She rejected the state agency consultants' opinions as to postural restrictions, but failed to "build an accurate and logical bridge from the evidence to [her] conclusion." *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016) (quoting *Clifford v. Apfel*, 227 F.3d 863, 872 (4th Cir. 2000)). As discussed above, the ALJ did not thoroughly evaluate Plaintiff's statements, the extent to which he performed ADLs and work activity, or the measures he used to address his pain. The court cannot engage in meaningful review of the ALJ's RFC assessment because it is "left to guess how the ALJ arrived at [her] conclusions." *Mascio*, 780 F.3d at 637. Therefore, the ALJ's RFC assessment is not supported by substantial evidence.

III.    Conclusion

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned reverses and remands this matter for further administrative proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

IT IS SO ORDERED.

February 1, 2021
Columbia, South Carolina

Shiva V. Hodges
United States Magistrate Judge